| | |
|---|---|
| **UNITED STATES of AMERICA ex rel. TRAVIS GROB**, <br><br> Plaintiff–Relator, <br><br> v. <br><br> **PRECISION CABLE ASSEMBLIES, INC.; PRECISION CABLE ASSEMBLIES (QINGDAO) LLC a/k/a QINGDAO PRECISION CABLE ASSEMBLIES, CO. LLC; GLOBAL ENGINEERED PRODUCTS, INC.; GEP-POWER PRODUCTS, LLC; RYAN SCHMUS; AND RICHARD HORKY,** <br><br> Defendants | Civil Action No.: <br><br> Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2) <br><br> **PLAINTIFF– RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS** |

## COMPLAINT

On behalf of the United States of America, Plaintiff-Relator Travis Grob (the "Relator") brings this action under the False Claims Act, 31 U.S.C. § 3729 *et seq.* against Precision Cable Assemblies, Inc. ("PCA"), Precision Cable Assemblies (Qingdao) LLC ("PCA QD"), Global Engineered Products, Inc. ("GEP"), GEP-Power Products, LLC ("GEP-Power"), Ryan Schmus, and Richard Horky (together, the "Defendants"). On his own behalf, the Relator also brings a claim for retaliation under the False Claims Act, 31 U.S.C. § 3730(h).

1. This action concerns a longtime scheme to underreport cost of goods to the Bureau of Customs and Border Protection ("Customs"), for the purpose of reducing obligations owed to the United States for customs duties. Although the Defendants used the "true" cost of goods for some business purposes, such as compensating the

corporate entity operating in China and charging its customers, it falsely deflated cost of goods when reporting information to Customs through its broker, thereby massively underpaying customs duties due to the United States.

## PARTIES

2.      Plaintiff-Relator Travis Grob (the "Relator") is an individual who resides in Racine County, Wisconsin.  The Relator was Vice President of Operations of Defendant Precision Cable Assemblies, Inc. until his termination in November 2021.

3.      Defendant Precision Cable Assemblies, Inc. ("PCA") is a company organized under the laws of the State of Wisconsin, with a principal place of business in Waukesha County, Wisconsin.  Its business address is 16830 Pheasant Drive, Brookfield, Wisconsin, 53005.  Prior to June 30, 2010, PCA operated under the name Precision Cable Assemblies LLC.  PCA is engaged in the business of manufacturing wire harness assemblies and related products for use in electromechanical systems, primarily as a contract manufacturer for third parties.

4.      Defendant Precision Cable Assemblies (Qingdao) LLC ("PCA QD"), also known as Qingdao Precision Cable Assemblies, Co. LLC, is a wholly owned subsidiary of PCA that manufactures cabling assemblies and wiring harnesses.  PCA QD has its own import/export department and trading license, and operates out of a manufacturing facility in ShanDong Province, China.  Its business address is Precision Cable Assemblies Co. LLC, No. 157 ZhuZhou Road, Qingdao Hi-Tech Industrial Park, ShanDong Province, China.

5.     Defendant GEP-Power Products, LLC ("GEP-Power") is a company organized under the laws of the State of Wisconsin, with a principal place of business in Waukesha County, Wisconsin.  Its business address is 16830 Pheasant Drive, Brookfield, Wisconsin, 53005.  GEP-Power designs wire harness assemblies and related products for use in electromechanical systems, operating as a de facto "in house" design unit at PCA.

6.     Defendant Global Engineered Products, Inc. ("GEP") is a company organized under the laws of the State of Wisconsin, with a principal place of business in Waukesha County, Wisconsin.  Its business address is 16830 Pheasant Drive, Brookfield, Wisconsin, 53005.  GEP owns certain wire harness assembly designs, and also acts as a consignee of imports intended for PCA.

7.     Defendant Ryan Schmus is an individual who resides in Waukesha County, Wisconsin.  Schmus acts as CEO of both PCA and GEP-Power, and is the majority owner of PCA, PCA QD, GEP-Power and GEP, either directly or through other corporate entities.

8.     Defendant Richard Horky is an individual who resides in Ozaukee County, Wisconsin.  Horky acts as President and COO of both PCA and GEP-Power, and is a minority owner of PCA, PCA QD, GEP-Power and GEP, either directly or through other corporate entities.

**JURISDICTION AND VENUE**

9.     Pursuant to 28 U.S.C. § 1331, this District Court has original jurisdiction over the subject matter of this civil action since it arises under the laws of the United States, in particular the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq.  In addition,

3

the FCA specifically confers jurisdiction upon the United States District Court, 31 U.S.C. § 3730(b). This Court has supplemental and diversity jurisdiction over the Relator's common law breach of contract claim.

10.     This District Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because the FCA authorizes nationwide service of process and all defendants have sufficient minimum contacts with the United States of America.

11.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because each of the Defendants transacts business or resides in this judicial district.

## STATUTORY AND REGULATORY FRAMEWORK

### The False Claims Act

12.     The False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA") provides for liability to the United States for, among other acts, knowingly causing the submission of false or fraudulent claims for payment to the United States, and knowingly using a false record or making a false statement material to a false claim. 31 U.S.C. § 3729(a)(1)(A)-(B).

13.     The FCA also provides for liability for persons who underpay or avoid paying money to the United States under the FCA's so-called "reverse false claims" provision. 31 U.S.C. § 3729(a)(1)(G). That provision imposes liability on any person who:

> knowingly makes, uses, or causes to be made or used, a false
> record or statement material to an obligation to pay or
> transmit money or property to the Government, or
> knowingly conceals or knowingly and improperly avoids or

> decreases an obligation to pay or transmit money or
> property to the Government . . .

For purposes of 31 U.S.C. § 3729(a)(1)(G), the term "obligation" is defined as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

14.     Under 31 U.S.C. § 3729(a)(1)(C), the FCA also imposes liability for knowingly conspiring to violate other provisions of the FCA, including 31 U.S.C. § 3729(a)(1)(A), (B), and (G).

15.     The FCA, 31 U.S.C. § 3729(a)(1), provides that subject to damage limitations specified at 31 U.S.C. § 3729(a)(2), any person who violates the FCA is liable to the United States for treble damages, and for civil penalties of not less than $5,000 and not more than $10,000.  Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the FCA civil penalties were adjusted to a range of $5,500 to $11,000 for each violation occurring on or after September 29, 1999.  Pursuant to the Bipartisan Budget Act of 2015, FCA civil penalties for violations occurring after November 2, 2015 are adjusted for inflation on a yearly basis, and are currently adjusted pursuant to 86 Fed. Reg. 70742 to a range of $11,803 to $23,607.

16.     The FCA statute establishes standing for private persons to bring suit on behalf of the United States through its qui tam provisions at 31 U.S.C. § 3730.

17.     Pursuant to of 31 U.S.C. § 3730(h), the FCA also protects provides a private right of action to employees, contractors, or agents who have experienced retaliation for acting in furtherance of an FCA action or for their efforts to stop one or more violations of the False Claims Act.  Under 31 U.S.C. § 3730(h), persons are entitled to all relief necessary to make them whole for retaliatory acts, including for discharge, demotion, suspension, threats, harassment, or discrimination "in any other manner."

**Tariff Act Reporting Requirements for Importers of Record**

18.     The United States of America, through Customs, collects duty for the import of goods into the United States pursuant to the Tariff Act of 1930, 19 U.S.C. §1202 *et seq*, determined using the Harmonized Tariff Schedule ("HTS"), which is published and maintained by the United States International Trade Commission.

19.     To enable Customs to properly assess duties on imported merchandise and to enable Customs to determine whether other requirements of law are met, an importer is required to file certain "entry documents" with Customs.  19 U.S.C. § 1484(a)(1)(B).  Among the information required in these documents are the value of the merchandise, a type of information commonly referred to as "cost of goods."  An importer must also identify an HTS classification and provide an estimate of the correct amount of duties, fees, and other charges and exactions.

20.     19 U.S.C. § 1484 provides that for entries filed electronically, "each transmission of data shall be certified by an importer of record or his agent, one of whom shall be resident in the United States for purposes of received service of process,

as being true and correct to the best of his knowledge and belief, and such transmission shall be binding in the same manner and to the same extent as a signed document."

21.     19 U.S.C. § 1485(a) provides that for any entry under § 1484, an importer of record must make and file, or electronically transmit, a declaration under oath stating:

> (1) Whether the merchandise is imported in pursuance of a purchase or an agreement to purchase, or whether it is imported otherwise than in pursuance of a purchase or agreement to purchase;

> (2) That the prices set forth in the invoice are true, in the case of merchandise purchased or agreed to be purchased; or in the case or merchandise secured otherwise than by purchase or agreement to purchase, that the statements in such invoice as to value or price are true to the best of his knowledge and belief;

> (3) That all other statements in the invoice or other documents filed with the entry, or in the entry itself, are true and correct; and

> (4) That he will produce at once to the appropriate customs officer any invoice, paper, letter, document, or information received showing that any such prices or statements are not true or correct.

22.     Under 19 U.S.C. § 1484(a)(1), the importer of record must use "reasonable care" in complying with reporting requirements including those of § 1484(a)(1)(B), which include the declaration required by § 1485(a).

### Marking Duties

23.     An importer of record must also identify the country of origin of imported goods, in entry documents and also by marking the goods themselves. Pursuant to 19 U.S.C. § 1304(a), imported goods must be "marked in a conspicuous place as legibly,

indelibly, and permanently as the nature of the article (or container) will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article."

24.     Pursuant to 19 U.S.C. § 1304(i), goods that are not properly marked with their country-of-origin are subject to a special category of customs duties, referred to as "marking duties," which are assessed at "10 per centum ad valorem" and "shall be deemed to have accrued at the time of importation, shall not be construed to be penal, and shall not be remitted wholly or in part nor shall payment thereof be avoidable for any cause." Pursuant to 19 U.S.C. § 1503, this marking duty is not based on the retail value of the goods, but is rather assessed as a fixed percentage of the dutiable value of the imported commodity.

25.     When a product consists of materials and labor from more than one country, the country-of-origin is the place where the materials have been "substantially transformed into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was so transformed." 19 U.S.C. § 2518(4)(B).

26.     In advisory rulings, Customs has long held that simple assembly or packaging of a product does not amount to a substantial transformation. See HQ Ruling Letter 082747 (Customs and Border Prot. Feb. 23, 1989); see also HQ Ruling Letter H237742 (Customs and Border Prot. Aug. 26, 2015). Rather, Customs considers the totality of the circumstances, including the origin of a product's components, the

extent of processing occurring within a country, and whether such processing renders a product with a new name, character, and use.

27. For marking purposes, the determination of country of origin for products from Mexico may differ from that set forth in the Tariff Act, pursuant to the Agreement between the United States of America, the United Mexican States, and Canada ("USMCA"). For such goods, the country of origin for marking purposes may be the country in which the good is wholly manufactured or assembled (19 CFR § 102.1(o), § 102.11(a)(1)), or where the good undergoes a change in tariff classification (19 CFR § 102.11(a)(3)).

## FACTUAL ALLEGATIONS

28. PCA has been in business for over forty years. For more than ten years, it has specialized in the manufacturing of wire harnesses, battery cables and custom molded assemblies for wiring known as "connector overmoldings." PCA is engaged as a contract manufacturer by other companies, primarily in the United States, that manufacture tractors, refrigerators, and other complex electromechanical equipment.

29. For most of its business, PCA manufactures wire harnesses designed by other companies for specific, proprietary equipment. Wire harnesses, also sometimes known as wire harness assemblies, cable assemblies, wiring assemblies or wiring looms, are a complex assembly of electrical wires, cables and connectors that transmit electrical power and information signals. For complex applications, wire harnesses protect the assembly from vibrations, abrasions, moisture, and tangles, making the assembly more reliable, easier to install, and easier to fit within a device. For most of the last twenty

years, approximately 75% of PCA's manufacturing has been done by PCA QD in China, and imported into the United States.

30.     GEP-Power was originally created in 2007 to provide engineered power distribution product solutions in the transportation market, and to essentially fill a gap in PCA's manufacturing capabilities.  Although PCA always works as a contract manufacturer, GEP-Power enables PCA to offer in-house design services for wire harnesses and other products, offering designs for other companies' products.  As part of its services, when GEP-Power designs wire harnesses for clients, they are typically manufactured by PCA or one of its other subsidiaries.  GEP-Power also offers certain off-the-shelf wire harnesses and related products available for purchase and manufactured by PCA.

31.     GEP was created in 1998, and marketed itself as offering "Asian sourcing for 'value added' products and assemblies."  In recent years, GEP has also advertised itself as "GEP Source & Trade," and has operated as the importer of record for all products manufactured in China for PCA or GEP-Power.

32.     For more than ten years, PCA, PCA QD, GEP-Power and GEP  (the "Defendant Companies") have all functioned as one interconnected company, with many company officers serving in multiple businesses and with many employees having overlapping responsibilities.  Although PCA is the oldest company and was originally owned by the Harwood family, Ryan Schmus, who owned GEP before the companies' integration, purchased PCA around the time of their integration.  Schmus is now majority owner of all of the companies. Horky, owner of a minority stake in the

companies, had been a Vice President at PCA for more than ten years before the companies' integration, first of Manufacturing and then of Sales & Operations.

33. For several years leading up to March 2020, the Defendant Companies' China operations were overseen by Ken Hong. Hong also managed the companies' dealings with its shipping services provider, C.H. Robinson, which also acted as the Defendant Companies' customs broker.

**Underpayment to the United States Through False Statements to Customs**

34. For more than eight years until March 2020, Hong executed a scheme to defraud the United States at Schmus's direction. PCA QD was directed not to communicate directly with C.H. Robinson. Instead, PCA QD submitted invoices for the products in particular shipping containers to Hong, who, at Schmus's direction, devalued the cost associated with the products before submitting them to the broker. PCA QD's invoices were sent to Hong in an easily editable Excel format to facilitate the scheme.

35. Before resigning his position at PCA in March 2020, he warned others at the company about the scheme, explaining how invoices from PCA QD were being manipulated for the purpose of lowering tariff costs. Hong warned others at the company that they should steer clear of this practice if the owners of the company recruited them to take Hong's place.

36. After Hong resigned, Horky took over Hong's responsibilities with respect to the scheme, manipulating the Excel invoices from PCA QD before submitting them to C.H. Robinson for use with Customs. As Hong had foretold, however, Horky

recruited others at the business to assume this role in perpetrating the scheme. Horky explained to others at the companies that PCA's "legal team" had assured them that devaluing the invoices by a fixed percentage, frequently 50%, was justified because PCA supplied PCA QD with many of the raw materials used to produce their products, and PCA was permitted to estimate the material content of US supplied raw material in the products. Horky explained that the task was not difficult, as no analysis was necessary to calculate the devaluation, and it could be applied based on gut feelings.

37.     Within months after Hong's resignation, the Defendant Companies' organizational charts were significantly changed so that the Defendant Companies' finance team and the President of PCA QD reported directly to Schmus. Before Hong's resignation, Dennis Wick, the Vice President of Finance & Corporate Controller, reported to Horky, the companies' President and COO; afterwards, Wick reported directly to Schmus.

38.     Schmus did have experience with "Asian sourcing," having run GEP before the Defendant Companies' integration, but his intervention in the China operations was more pronounced, bypassing several levels of oversight that had been in place before. Just before Hong's resignation, Robert Chen, the President of PCA QD, reported to Hong, who in turn had reported to a Global Supply Chain Director, who in turn had reported to Horky. After Hong's resignation, Chen reported directly to Schmus.

39.     Both before and after Hong's resignation, Schmus's first company, GEP, acted as the importer of record or "consignee" for the shipments from PCA QD to PCA.

40.     After Hong's resignation, PCA QD sent their Excel invoices to a large group of people who worked for PCA and GEP-Power, including Horky, Wick, and more than twenty others.  This group included customer service representatives who interfaced directly with the Defendant Companies' clients, to whom the full cost of manufacture from PCA QD was passed on as an expense.

41.     While a large group of officers and employees at the Defendant Companies were privy to the true cost of manufacture from PCA QD through the emailed invoices, the number of persons who were aware of the Defendant Companies' submissions to C.H. Robinson for customs purposes was far smaller.  After Hong's resignation in March 2020, this process was overseen directly by Horky with direction by Schmus.

42.     In most months, PCA QD sent approximately 40 or 50 shipments to the United States, including many small shipments sent via FedEx or DHL.  It was common to make several significant shipments per month through C.H. Robinson via air freight.  In most months, PCA QD sent between 5 and 8 shipping container shipments through C.H. Robinson, or roughly 60-70 shipments per year.  Whereas some shipments may have consisted of just 200 or 300 individual pieces, shipments by sea might include 20,000 pieces at a time.

43.     Most shipments from PCA QD to PCA included parts for which HTS heading 8544.42.9090 applied, and was identified by PCA QD.  According to this heading, a 2.6% duty rate was owed on imports from most countries, including China.

Coming from China, however, goods with the 8544.42.9090 heading were subject to an additional 25% ad valorem rate of duty.

44. As a result of the Defendants' cost of good manipulation, they defrauded the United States of millions of dollars per year in duties by submitting, or causing others to submit, false information to Customs hundreds of times per year. One such occasion concerned a shipment sent by PCA QD on October 27, 2021, invoiced to PCA with a cost of goods of 1,386,733.46 Chinese renminbi, approximately $200,000. The container in which it was shipped (TCNU2256300) arrived at the Port of Los Angeles, California one month later, on November 27, 2021, at which time the importer of record, GEP, owed more than $50,000 in duty. Due to the Defendants' scheme, duty was underpaid for this shipment by more than $25,000.

45. Other examples of shipments for which Defendants unlawfully avoided an obligation to pay customs duties include:

    a. A shipment that arrived in Tacoma, WA on May 30, 2021, in containers UACU3427204, TCLU3989481, and UACU8197110 which was originally invoiced by PCA QD (invoice #PCA21115S) as including 3,147,715.74 renminbi worth of goods (approximately $450,000);

    b. A shipment that arrived in Los Angeles, CA on June 4, 2021, in containers TCLU4165840 and HLXU5216838 which was originally invoiced by PCA QD (invoice #PCA21095S) as including 2,432,040.57 renminbi worth of goods (approximately $350,000);

14

c. A shipment that arrived in New York or Newark on July 26, 2021, in container TRHU5726443 which was originally invoiced by PCA QD (invoice #PCA21170S-A) as including 1,200,178.75 renminbi worth of goods (approximately $175,000);

d. A shipment that arrived in Los Angeles, CA on August 23, 2021, in containers KKFU1509449 and KKFU1826530 which was originally invoiced by PCA QD (invoice #PCA25250S) as including 2,757,689.61 renminbi worth of goods (approximately $395,000)

e. A shipment that arrived in Portland, OR on October 6, 2021, in containers DFSU4116883 and GIPU4405559, originally invoiced by PCA QD (invoice #PCA21305S) as including 2,532,505.62 renminbi worth of goods (approximately $364,000);

f. A shipment that arrived in Los Angeles, CA on September 18, 2021, in containers GESU6591517 and MOFU1414690, originally invoiced by PCA QD (invoice #PCA21280S) as including 2,426,314.54 renminbi worth of goods (approximately $350,000);

g. A shipment that arrived in Long Beach, CA on November 16, 2021, in containers APZU4489460 and TRLU4754645, originally invoiced by PCA QD (invoice #PCA21360S) as including 1,782,809.27 renminbi worth of goods (approximately $255,000); and

h. A shipment that arrived in Seattle, WA on January 6, 2022, in container APZU4350351, originally invoiced by PCA QD (invoice #PCA21410S) as including 1,336,522.15 renminbi worth of goods (approximately $190,000).

46. In each instance in which goods were invoiced by PCA QD and then shipped to the United States, either through PCA or directly to one of Defendants' clients, Defendants altered the cost of goods invoiced by PCA in order to avoid an obligation to pay customs duties to the United States, resulting in underpayments totaling more than $2.5 million per calendar year for each of the last ten years. In some instances, including some of the example shipments listed in the preceding paragraph, Defendants knowingly and unlawfully avoided more than $50,000 in customs duties.

**Retaliation for Failure to Participate in Customs Fraud and False Marking**

47. On May 28, 2021, the Relator had a meeting with Schmus and Horky in Schmus's office regarding the return of a former employee who wished to be insulated from the PCA QD customs process by working directly for the Relator, instead of Horky. Immediately after that meeting, the Relator met with Horky in Horky's office, where the Relator explicitly stated that the former employee to be brought back did not want to be involved in the customs process for shipments from PCA QD, and Horky agreed.

48. The Relator's meetings with Schmus and Horky on May 28, 2021 were less than three months before the retaliation against the Relator began, and less than five months before the Relator's termination.

49.     Working conditions at the Defendant Companies had become strained during 2021, particularly for PCA and GEP-Power employees. PCA had constructed a new manufacturing facility in Monterrey, Mexico, in early 2017, and in 2021 PCA and GEP-Power were transferring much more of the companies' business to that facility. The Relator was charged by Schmus and Horky with leading this transition to manufacturing in Mexico.

50.     On August 27, 2021, Schmus communicated that all part numbers associated with an important product manufactured for client John Deere should be "moved" from PCA's production facility in Brookfield, WI to the Monterrey facility as soon as possible. John Deere soon found out that PCA was manufacturing this product, a cable assembly called "AUC16805," in Mexico, and requested that the company stop production there – but they were in urgent need of the part.

51.     On August 28, 2021, Schmus and Horky met with the Relator to better understand the issue with AUC16805. Some units had already been manufactured in Mexico and transferred to PCA's warehouse in Waukesha, but none of the Mexico parts had been shipped to John Deere. Schmus ordered the Relator to have PCA employees in the United States "inspect" the Mexico-manufactured units, and then change the label from Made in Mexico to Made in the USA. The Relator refused the order from Schmus to violate U.S. marking laws, stating that it would be unethical to do so. Schmus asked the Relator how the change in marking would be unethical, and the Relator responded that it would be in violation of supplier agreements with John Deere and particularly unethical considering John Deere had stated recently and clearly that

17

they did not want the product manufactured in Mexico. Schmus insisted that changing the label had nothing to do with ethics, and that the Relator did not understand ethics or "how things work." Schmus insisted that the Relator change the units' marking, and the Relator again refused.

52. Later on August 28, 2021, the Relator held a meeting with his leadership group in which he raised the possibility of changing the units' marking, in order to get opinions from the group. All agreed that while Deere would never notice the difference, changing the units' marking would be unethical.

53. In the months immediately following August 2021, the Relator was given more and more responsibility, such that he worked up to 70 hours per week to keep up. PCA suffered a slew of resignations in 2021, including members of the Relator's leadership team with whom he had met on August 28, 2021. Among the key personnel who resigned were the manager of PCA's main warehouse in Waukesha, WI, the Director of Operations at the company's Brookfield, WI headquarters, a key customer service representative, the engineering manager to whom PCA and GEP-Power project engineers reported, a production shift supervisor, the Director of Strategic Sourcing, and the process engineer manager who oversaw PCA's maintenance technicians and process techs.

54. After August 2021, the transition to Mexico was accelerated by Schmus and Horky. They decided that positions would not be backfilled in the U.S., and that Mexico would have to assume the responsibilities of personnel who had resigned, responsibilities for which the Mexico facility was not prepared. As a result, the Relator

was expected to fulfill many of these responsibilities, and was required to travel to Mexico to an increasing degree, including for nearly 20 days in October and November 2021.

55.     On November 16, 2021, while the Relator was on assignment in Mexico, he contacted Horky about the unreasonable and deteriorating work conditions to which the Relator had been subjected, and that he was not doing well and burning out.  Later that day, Schmus pivoted a scheduled conference call with the Relator within minutes of its start to switch a new set of responsibilities, of providing quotes from new products, away from the U.S. facilities to Monterrey.  Although the Relator insisted that Monterrey could not yet handle the new responsibilities, Schmus insisted the change be made immediately, and those on the call agreed that the Relator should be sent the instructions for the new work.

56.     Late in the evening of November 16, 2021, the Relator requested a meeting with Schmus and Horky on the following Monday, November 22.  Horky originally agreed.  At nearly 6pm on November 18, however, Horky emailed to postpone the meeting to November 29th, stating that Schmus and Horky would not be in the office the week of the 22nd and that the Relator should also take the time off.

57.     The Relator found out over the weekend that Horky would be in Mexico on November 22, and with Schmus and another senior manager out of the office, the Relator felt obligated to go to work.  Soon after he began working at 7:30am, however, Schmus also came into the office, and requested that the Relator go to Schmus's office to meet with him.

58.     In Schmus's office, Schmus insisted that the Relator leave PCA for the week, and that they would meet, with Horky, on the following Monday, the 29th. When the Relator insisted there was work he needed to do, Schmus stated that he wanted the Relator out. When the Relator again indicated he could stay, Schmus stated that the building was his and that he was throwing the Relator out of it.

59.     The Relator left the building. By the time he was home, some 40 minutes later, all of his work accounts had been disabled. The Relator contacted PCA's IT department, who told the Relator that Schmus had ordered them to disable the Relator's accounts.

60.     Schmus and Horky never met with the Relator on November 29th. Before the meeting could occur, Horky called the Relator on the phone to set up a 1 on 1 meeting with the Relator in advance, but instead called the Relator on Sunday, November 28th.

61.     Horky terminated the Relator on the November 28th phone call. During the call, Horky made it clear that the Relator was not being terminated for performance reasons. He stated that the Relator was a great employee who would be successful in most companies, but not at PCA because of Schmus. Horky reminded the Relator that he had said previously that Schmus was very difficult to work with. He stated that the Relator was not a "yes man," which Horky valued, but that Schmus needed a "yes man" and was the owner and had final say. He said they had decided to let the Relator go, even though Horky knew he was "shooting" himself for doing it. Horky re-stated that "Ryan needs a yes man and you are not a yes man."

## COUNT I: VIOLATION OF THE REVERSE FALSE CLAIMS PROVISION OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(G), AGAINST ALL DEFENDANTS

62.     The Relator incorporates by reference the preceding paragraphs as though fully set forth herein.

63.     As set forth above, Defendants knowingly made or used false statements and records about its imported products to Customs that were material to Defendants' obligation to pay custom duties to the United States, within the meaning of 31 U.S.C. § 3729(a)(1)(G).

64.     As a result of Defendants' false statements regarding the cost of goods imported by PCA from PCA QD, Defendants frequently and fraudulently underpaid customs duties by 50%, and sometimes as much as 70%, from at least April 2012 through the present.

65.     For purposes of 31 U.S.C. § 3731(b), the Relator alleges that by representing GEP to be the consignee for PCA QD goods meant for PCA, the Defendants fraudulently concealed their continuing violations of 31 U.S.C. § 3729(a)(1)(G) from the United States.

66.     By reason of Defendants' conduct to avoid full payment of custom duties, the United States has sustained damages in an amount to be determined at trial.

## COUNT II: VIOLATION OF THE CONSPIRACY PROVISION OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(C), AGAINST ALL DEFENDANTS

67.     The Relator incorporates by reference the preceding paragraphs as though fully set forth herein.

68. In furtherance of the scheme to avoid obligation to pay customs duties, Defendants conspired with each other by producing two sets of invoices and submitting false invoices to Customs through their customs broker, in violation of 31 U.S.C. § 3729(a)(1)(C), from at least April 2012 through the present.

69. For purposes of 31 U.S.C. § 3731(b), the Relator alleges that by representing GEP to be the consignee for PCA QD goods meant for PCA, the Defendants fraudulently concealed their continuing violations of 31 U.S.C. § 3729(a)(1)(C) from the United States.

70. By reason of the conspiracy engaged in by Defendants, the United States has sustained damages in an amount to be determined at trial.

**COUNT III: VIOLATION OF THE ANTI-RETALIATION PROVISION OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(h), AGAINST PRECISION CABLE ASSEMBLIES, INC., GEP-POWER PRODUCTS, LLC, GLOBAL ENGINEERED PRODUCTS, INC., RYAN SCHMUS, AND RICHARD HORKY**

71. The Relator incorporates by reference the preceding paragraphs as though fully set forth herein.

72. The Relator seeks relief against Defendants under the anti-retaliation provision of the False Claims Act, 31 U.S.C. § 3730(h).

73. The Relator was engaged in conduct protected by the anti-retaliation provision of the FCA. 31 U.S.C. § 3730(h). As an employee of PCA, he refused to facilitate Defendants' underpayment of customs duties, or to falsely mark the country of origin of goods that would have resulted in an obligation of marking duties. As a

result, Defendants made his position increasingly demanding, and finally terminated his employment.

74. By reason of Defendants' conduct, the Relator has sustained damages in an amount to be determined at trial.

## RELIEF REQUESTED

WHEREFORE, the Relator, on his own behalf and on behalf of the United States, requests that judgment be entered in his favor, ordering that:

a. Against Defendants on Count I, for Violation of the Reverse False Claims Provision of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G), that the United States be awarded treble the damages calculated at an amount to be determined at trial, plus $23,607 penalty for each false statement submitted to Customs for the purpose of decreasing an obligation to pay a duty;

b. Against Defendants on Count II, for Violation of the Anti-Retaliation Provision of the False Claims Act, 31 U.S.C. § 3730(h), that the Relator be awarded two times the amount of back pay he would have earned but for the retaliation, special damages required to make him whole, reinstatement of the Relator to the same seniority position he would have enjoyed but for the wrongful retaliation, and interest on that award;

c. The Relator be awarded a percentage of the proceeds of the action in accordance with 31 U.S.C. § 3730(d);

d. The Relator be awarded his costs and reasonable attorneys' fees for prosecuting this action in accordance with 31 U.S.C. § 3730(d) and (h); and

e. Entering such other relief which the Court deems just and equitable.

Respectfully submitted, by:

Plaintiff-Relator Travis Grob,

By his attorneys,

Date: May 12, 2022        /s/ James M. Payne

James M. Payne (SBN: 1105889)
jmp@rizzolaw.com
RIZZO & DIERSEN, S.C.
3505 30th Avenue
Kenosha, WI 53144
Telephone: (262) 652-5050
Facsimile: (262) 652-5053

Thomas M. Greene (Application pending;
Massachusetts BBO #210020)
tgreene@greenellp.com
Ryan P. Morrison (Application pending;
Massachusetts BBO # 680238)
rmorrison@greenellp.com
**GREENE LLP**
One Liberty Square, Suite 1200
Boston, MA 02109
(617) 261-0040